[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal by the plaintiffs from the assessment of damages in the amount of $924,800 paid by the defendant for the partial taking by CT Page 6220-z eminent domain on September 12, 1991, of their property situated on the southerly side of Cottage Grove Road, also being Route 218, in the Town of Bloomfield, pursuant to the provisions of General Statutes Sections13a-73(b) and (f),[1] for the layout, alteration, extension, widening, change of grade and improvement of the highway known as Route 218.
Said premises are more particularly bounded and described as follows: Northerly by Cottage Grove Road, Route 218, 1,746.15 feet; Easterly by land n/o/f/o Rheal J. Bouchard et al., 94 feet, more or less; Southerly by the plaintiffs' remaining land, 1,719 feet, more or less, being the line designated "Taking Line," as shown on the map hereinafter referred to; and Westerly by land n/o/f/o Victoria Williams, 126 feet, more or less.
Said parcel contains 4.23 acres, more or less, together with all appurtenances, all of which more particularly appears on a map entitled: "Town of Bloomfield, Map Showing Land Acquired From Bercrose Associates And Connecticut Packing Co., Inc., By The State of Connecticut, Reconstruction of Conn. Route 218, Scale 1" = 40', Nov. 1990, Robert Gubala, Chief Engineer Highways." Sheets 1, 2, 3 and 4 of 4 Sheets. (11-136-20)."
Said premises were taken with the following easements and rights on CT Page 6220-aa portions of the plaintiffs' remaining land, as more particularly shown on the above-entitled map:
1. Two full and perpetual easements for highways purposes and appurtenances within a total area of 0.014 of an acre, more or less, and located between and opposite Station 73+75 and approximate Station 74+08 right, and Station 62+87 and approximate Station 63+22 right, Base Line present Cottage Grove Road, Route 218.
2. A right to reconstruct driveways within an area of 0.395 of an acre, more or less, and located between and opposite approximate Stations 62+15 and 63+08 right, 67+32 and 67+94 right, said Base Line.
3. A right to grade within a total area of 0.170 of an acre, more or less, and located between and opposite approximate Stations 59+10 and 59+55 right, 62+73 and 62+80 right, and 66+28 and 67+43 right, and 67+67 and 68+00 right, said Base Line.
4. A right to install sedimentation control system within a distance of 910 linear feet, more or less, and located between and opposite approximate Stations 59+10 and 59+80 right, 67+85 and 68+05 right, 69+63 and 73+52 CT Page 6220-bb right, and 73+85 and 76+38 right, said Base Line.
5. A right to construct concrete sidewalks within an area of 0.013 of an acre, more or less, and located between and opposite approximate Stations 62+00 and 62+25 right, 62+80 and 62+87 right, and 73+03 and 73+24 right, said Base Line.
The above-described four rights shall terminate automatically upon completion of the work by the defendant.
Under the authority of General Statutes Section 13a-73(f) the defendant took and terminated the plaintiffs' rights of access to and from that 261 foot, more or less, portion of present Cottage Grove Road beginning at a point on the "Taking Line", which intersects the boundary line with land n/o/f/o Victoria Williams; thence running easterly along said "Taking Line", 261 feet, more or less, to a point on said "Taking Line", which is situated opposite Station 61+80 right, said "Base Line", as more particularly shown on Sheet 1 of the above-described map.
Said premises were taken together with the plaintiffs' mutual rights for operation of a shopping center with cross parking rights on the land CT Page 6220-cc taken.
Prior to the taking the subject property consisted of a parcel of land containing about 119.2 acres, at street grade, fronting on the south side of Cottage Grove Road, Route 218, for a total length of 1746.15 feet. The frontage of the property is zoned Residence 10 (R-10) for a depth of 200 feet, excluding the four driveways, which, together with the remainder of the property is zoned Industrial 1 (I-1) permitting most retail businesses.
Approximately one-third of the northerly portion of the site has been developed commercially with the Copaco Shopping Center, the only regional shopping area in Bloomfield. It is located near the heavily populated northern part of Hartford. There are six buildings of varying sizes and tenancies surrounding and enclosing a central parking area.
On the east side is a large free-standing structure built in 1971 and occupied solely by a major tenant, Ames Department Store, formerly known as Zayre's. On the south is the main retail building erected in expansive stages from 1933 to 1978. Its anchor tenant, located centrally, is Waldbaum's Food Mart, formerly Copaco. Additional occupants consist of 21 retail stores, two restaurants, one bank, and a slaughter house in a wing to CT Page 6220-dd the west and rear.
The west side is framed by another free-standing building erected in 1956 and extended in 1973 and 1981. It contains five stores, one office, and a McDonald's restaurant conveniently located nearest the street. Behind the restaurant, and separated from it by a roadway, is a fourth component of the shopping complex, the Motomart Auto Supply building. On the north or street side and at the east end of the main or central driveway is a building leased to Shawmut Bank and its predecessors. Across the driveway and closer to the street is a small old nonconforming wooden storage barn used for seasonal businesses. A wing on its west side is a shelter for domesticated animals that roam in a small fenced range and "trademark" the original business of plaintiff Connecticut Packing Company.
There were three driveways for access to and egress from the shopping center. The principal driveway was the one in the center between the bank and the barn and located opposite the main building. The east roadway ran across the front of Ames Department Store. The west roadway approached the complex across the front of McDonald's. Behind McDonald's and primarily serving the Motomart auto parts store was a smaller driveway providing ingress only for traffic heading easterly on Cottage Grove Road. CT Page 6220-ee
To the south of the McDonald's and Motomart land, to the west of the main parking area, and to the north of land in the rear of the shopping plaza is a parcel of land about 2.9 acres in size and containing about two acres of wetlands. On August 28, 1989, this tract of land was conveyed by the State of Connecticut to the plaintiffs for $210,000, or $72,413.79 per acre and $1.66 per square foot. Although this acquisition removed a jog in the shopping center property and straightened its western boundary, to this date it has not been incorporated as part of that development and remains subject to the Inland Wetlands and Watercourses Regulations, together with about 55 percent of the land in an irregular pattern to the rear of the shopping center.
Because of its lack of development and its wetlands soil characteristic, the approximately 2.9 acres of land to the west of the shopping plaza acquired two years before the taking is classified as a part of the contiguous land located to the rear of the development, making the total acreage of the rear land about 84.14 acres and the acreage of the shopping center before the taking about 35.06 acres. This division of the total acreage conforms to that made by the defendant and the appraisals made in its behalf by its two experts. CT Page 6220-ff
The rear land has intervals of street frontage counterclockwise from Cottage Grove Road as follows: 138.94 feet along the easterly side of Goodman Street; 90 feet, more or less, along the angle of its terminus; 718.69 feet along the northerly side of Tobey Road; 300 feet along Mosey Drive; and 621.15 feet along the unaccepted and unimproved extension of Mosey Drive.
About the northerly one-third of the rear land is separated from the southerly two-thirds by a railroad spur right of way owned by the Town of Bloomfield by grant from the plaintiffs on April 24, 1964. In their warranty deed the plaintiffs reserved "the right to pass and repass on foot or with vehicles of any kind over and across the premises herein conveyed at any and all points but without damage to or interference with any railroad side track which may be laid out within said Railroad Spur."
The principal portion of the defendant's taking consisted of about 4.23 acres in fee along the entire frontage on Cottage Grove Road, or 12% of the approximately 35.06 acre shopping center, leaving a remainder of about 30.83 acres.
Also significant were the taking of rights of access to and from 261 CT Page 6220-gg feet, more or less, at the most westerly frontage of the property on Cottage Grove Road, thereby eliminating the driveway at that location which provided immediate access to the Motomart auto parts store and the McDonald's building, and thereafter to the large common parking area, and two full and perpetual easements for highway purposes and appurtenances within a total area of 0.014 of an acre, more or less, immediately adjoining on the east the reconstructed easterly and westerly driveways.
There were four additional rights taken. Although these were designated as temporary rights to be terminated upon completion of the work by the state, the work under these temporary rights was permanent at the site. These were the following: (1) the right to reconstruct the three remaining driveways within an area of about 0.395 of an acre; (2) the right to grade within a total of about 0.170 of an acre; (3) the right to install a sedimentation control system within a distance of about 910 linear feet; and (4) the right to construct concrete sidewalks within an area of about 0.013 of an acre.[2]
The defendant utilized two appraisal reports compiled by separate experts who testified in court. The first report valued the plaintiffs' property as of February 1, 1991. This appraisal, prepared by John B. Flint, CT Page 6220-hh estimated the taking damages at $863,000. In testifying he found no change in his valuations and estimate of damages as of the date of taking, September 12, 1991. The damages paid, however, were in conformity with a later appraisal by a subsequent appraiser.
The highest and best use of the subject property was in Flint's opinion its continued use as a regional shopping center. The subject is located on an arterial route in a densely developed area. It has been successful and has a strong support network.
Since the taking was within the "green belt" and greatly narrowed the R-10 zone area, based on his research he anticipated that the non-conformity of the old barn would be varied, and that the remainder of the R-10 area would likely be changed to I-1 zone in the future if the plaintiffs proceed with their proposed plans for reconstruction and expansion. The wetlands on the property were recently remapped as a prelude to future expansion.
Pursuant to the defendant's instructions, Flint appraised the 35.06 acres of the shopping center only. In his opinion the rear land was excess acreage and did not contribute to the value of the shopping center. At the time of the taking the rear land did not sustain its operation. Based CT Page 6220-ii on the sales comparison of four smaller commercial tracts located in Meriden, Berlin, South Windsor and Bloomfield, after indicated adjustments he estimated the land to be valued before taking at $185,000 per acre, or $6,486,000 for the shopping plaza acreage.
The Marshall Valuation Service was used to estimate the contributory value of various site improvements affected by the taking, such as paving, lighting fixtures and poles, fencing, signs, shed and utility building replacements, landscaping, etc. Based on cost he estimated the before taking valuation of these items of damage to be $44,000.
In determining severance damage due to the taking of access and removal of the westernmost and entrance-only driveway, he utilized the income approach to valuation only for the Motomart building, since "[t]his traveled way is used by motorists to gain access to [Motomart]." The before taking valuation of this building with appropriate support area for parking was estimated to be $736,000.
Based on these three valuations, he estimated the before taking value of the subject property to be $7,266,000. The plaintiffs' undeveloped rear property and site improvements were assigned an "X" value, denoting no value CT Page 6220-jj relevant to this taking.
In ascertaining the value of the 30.83 acres of the shopping center remaining after the taking, Flint used the same four adjusted comparable sales utilized in his analysis of the before taking value, thereby reaching the same valuation of $185,000 per acre for an initial land value for 30.83 acres of $5,703,550. From this valuation he deducted the value of the permanent easements within 0.014 of an acre calculated at 50% of fee value. Subtracting $1295 for these easements, he estimated the net value of the land after taking to be $5,702,255, rounded to $5,702,000.
As hereinbefore indicated, he utilized the income approach to value the Motomart building in determining the severance damage caused by the taking of access and removal of the westernmost driveway. Its after taking value was estimated at $701,000 rounded. Based on these estimates of value, he found the total after taking valuation to be $6,403,000. An "X" value was assigned again to the rear land and site improvements unaffected by the taking.
Damages due to the taking were summarized as follows: value of the appraised property before taking — $6,486,000; plus damage to site CT Page 6220-kk improvements — $44,000; less land value after taking — $5,702,000; damage due to taking — $828,000; plus severance damage to Motomart building ($736,000 before taking value less $701,000 value after taking) — $35,000; total damages — $863,000. From these calculations, he concluded the fair market value of the subject property appraised to be $7,266,000 + "X" before the taking and $6,403,000 + "X" after the taking, resulting in damages to the plaintiffs of $863,000.
Richard H. Batty appraised the plaintiffs' property for the defendant as of March 22, 1991, pursuant to the same description and instructions given earlier to Flint. He found no change thereafter to the date of taking and estimated the plaintiffs' damages to be $924,800, the amount paid subsequently to them.
Agreeing with Flint, in his opinion the highest and best use of the subject property is for continuation of its present use with potential expansion. Based on his research, there is a strong probability of a zone change for the frontage to be rezoned I-1. In addition, there are proposed plans by the owners for reconstruction and expansion of the existing facility.
As instructed by the defendant, he appraised the 35.06 acres of the CT Page 6220-ll shopping center only. Based on three of the four comparable sales utilized by Flint, but with different adjustments, he agreed in his conclusion that the subject land had an estimated unit value of $185,000 per acre and a total value of $6,486,000 for the shopping area of 35.06 acres.
He also used the Marshall Valuation Service to estimate the contributory value of the site improvements affected by the taking. This value he found to be $63,500 before the taking. He also concurred in Flint's conclusion with respect to severance damages incurred only as to the Motomart building. For this estimate he also used the income approach, and found the value of this building before the taking to be $773,000.
Based on these three valuations, he estimated the before taking value of the subject property to be $7,322,500. An "X" or no value was assigned to the undeveloped rear land and site improvements unaffected by the taking.
The three comparable sales and adjustments utilized in the before taking valuation were deemed applicable to the after taking valuation. Using the same calculations as Flint for the easement adjustment to the remaining fee, he also estimated the net value of the land after taking to be $5,702,255, rounded to $5,702,000. CT Page 6220-mm
In determining the severance damage to the Motomart building because of the elimination of its access driveway, he reduced its before taking value previously obtained through the income approach by 10%, his estimate of the severance damage. Its after taking value, therefore, was $695,700. Based on these estimates, he found the total after taking valuation to be $6,397,700, plus an "X" value for the rear land and site improvements unaffected by the taking.
Damages due to the taking were summarized as follows: value of the taking — $847,500; plus damage to the remainder — $77,300; total damages — $924,800. From these calculations, he concluded the fair market value of the subject property appraised to be $7,322,500 + "X" before the taking and $6,397,700 + "X" after the taking, resulting in damages to the plaintiffs of $924,800.
At the hearing, Batty testified that after a recent viewing of the property subsequent to the completion of the road project, he is now of the opinion that there was no severance damage to the Motomart building. This conclusion he relates back to the date of his written evaluation and the date of taking. In his testimony he considered the property to have better CT Page 6220-nn and easier ingress and egress even without the former westernmost entrance that was eliminated in the road reconstruction after the taking of access there. Based on this reconsideration, he now concludes that his estimate of severance damage in the amount of $77,300 was in error and should be withdrawn from his prior report, reducing the damages due to the taking to $847,500.
In addition to their demand for fair and just compensation for the taking of their property in this eminent domain proceeding, the plaintiffs seek severance damage to the remainder of their property. This is based on their claim that the reconstruction of Cottage Grove Road has dramatically lessened the traffic efficiency of the driveways, primarily due to the closing of the former one-way entrance at the northwesterly corner and the significant shortening of the stacking or queuing space available to exiting traffic at the remaining three reconstructed driveways. They assert that this is most troublesome at the westernmost driveway opposite Tyler Street, where the reconstruction has reduced the availability of queuing space by more than 50%, and created traffic congestion within the driveway at the intersection of the westernmost drive and the roadway north of McDonald's leading to Motomart. Elimination of the stop sign in that area and the designation of the roadway to Motomart as CT Page 6220-oo one-way counterclockwise became necessary immediately after reconstruction of the western driveway in order to reduce congestion.
This claim was supported by the testimony and report of a traffic expert, Frederick A. Hesketh. His measurements are significant. At the easterly driveway, prior to reconstruction its layout provided about 220 feet of fully curbed driveway between the south edge of Cottage Grove Road and the intersection of the driveway with the parking lot where turning maneuvers occur. This length has been reduced to 120 feet, thereby limiting stacking from 10 to 5 or 6 cars. The center driveway has been reduced from a length of 180 feet to 100 feet of stacking or queue length, permitting about 4 cars in each of two lanes before impacting with internal cross traffic. The westerly driveway, which now has to absorb the westerly traffic that formerly used the one-way drive to the Motomart area, had the greatest reduction in length, from 220 feet to less than 100 feet, allowing a queue of only 4 vehicles.
In the opinion of the traffic engineer, the problems now existing, because of the configuration of the reconstructed three driveways in place of the original four, relating to internal traffic and stacking of exiting vehicles would be intensified in the event of the future expansion and CT Page 6220-pp development of the shopping center now under consideration.
Peter R. Marsele, Bloomfield Town Assessor and a licensed appraiser, testified as an expert for the plaintiffs without fee. Using records from his assessor's office, he described the total area as containing 110.09 acres, 30 acres of which was developed as the Copaco Shopping Center, and the remainder of 80.09 acres being rear land. His opinion as to the highest and best use of the property was in agreement with that of the defendant's two appraisers, namely, the continuation of its present use as a shopping center with the excess land to be used for expansion of the complex, subject to wetlands regulations.
Utilizing as comparables three sales of smaller parcels on a short street off the north side of Cottage Grove Road and a little to the west, after adjustments, but not for size, he estimated that the shopping center had a unit value of $180,000 per acre, and a total value of $5,400,000. No allowance was made in this estimate for the wetlands on about 2 of the 2.9 acres acquired from the state on August 28, 1989, which he included in the 30 acres allocated in his breakdown to the shopping center. In his testimony, however, he reduced the estimate on this parcel because of the extensive wetlands to $166,500 per acre. His estimate of the contributory CT Page 6220-qq value of various site improvements affected by the taking was $738,000, making the total value of the 30 acre shopping site before taking $6,138,000.
The same three comparable sales were utilized for valuing the excess land of 80.09 acres, but the unit value was reduced to $150,000 per acre for a total valuation before taking of $12,014,000. In summary, the total valuation of the 110.09 acres in the entire tract before taking was $18,152,000. The six buildings in the shopping center were valued by the cost approach utilizing the Marshall Valuation Service for a total estimate of $5,500,000. In this manner, Marsele estimated the total valuation of all land and buildings before taking to be $23,652,000. This valuation he supported, even though the income approach increased his estimate by $46,000.
After reciting the takings of fee, permanent easements, rights, access and land improvements in the taking area, and utilizing the same comparable sales as in the before taking valuations, Marsele stated that "[c]onsidering all the facts pertaining to subject land, it is my opinion there is a 10% loss in value to the shopping center land and the excess rear land, for the reasons detailed." With the loss of site improvements, he estimated the fair market value of all land to be $15,667,000. CT Page 6220-rr
In Marsele's opinion, four of the six buildings will be adversely affected by the taking because of the changing of the traffic flow caused by the shortened stacking in the driveways which will impede access lanes within the parking lot. Because the McDonald's and Motomart buildings will have the greater loss in value on account of the loss of the westernmost driveway, he gave them a 10% loss, while the Ames and bank buildings received a 5% loss. With these allowances, he found their total value after taking to be $5,369,000. In summary, the value of land and buildings after taking was $21,036,000.
Based upon his estimates, Marsele estimated the plaintiffs' damages due to the taking to be $2,616,000 broken down as follows: shopping center land damage — $1,283,000; buildings damage — $131,000; and excess land damage — $1,202,000.
In further recognition of traffic and parking problems created by the taking, the defendant presented evidence of a possible plan and cost of correction through Amerigo Scarpa, a registered professional engineer. The plan offered in exhibit was admittedly prepared on very short notice. Some of the parking depicted was illegal in that it violated CT Page 6220-ss the local fire lane parking ordinance. In defense of his proposal, the engineer stated that it was merely indicative that the problem could, with time and study, be improved. His similarly quick estimate of cost of site reconstruction was in the amount of $135,000. The conclusion to be drawn from the testimony of the two engineers, traffic and professional is that severance damage to the site was caused by the taking.
The highest and best use of the subject property is its continued use as a regional shopping center with potential expansion. It is located on an arterial state highway in a densely developed area. This successful operation has been in place for a number of years and it has a strong support network.
It is the function of this court to make an independent determination of value and fair compensation for the property taken in the light of all circumstances, the evidence, the opinions of the expert witnesses, its knowledge of the elements that establish value, and a viewing of the premises and surrounding area. Minicucci v. Commissioner of Transportation,211 Conn. 383, 388 (1989). We find that the before taking value of the subject property was $7,467,700 + (X) for the value of the property CT Page 6220-tt unaffected by the taking, and that the after taking value is $6,397,700 + "X". Damages, therefore, are assessed at $1,070,000.
Judgment may enter for the plaintiffs in the amount of $1,070,000, less $924,800 already paid, or an excess of $145,200, with interest on such excess from the date of taking to the date of payment, together with costs.
William C. Bieluch
George D. Stoughton
Maurice J. Sponzo State Trial Referees